**John SEFICK, Plaintiff,**

v.

**The CITY OF CHICAGO, Mayor Jane Byrne, the Chicago Council on Fine Arts, Mrs. Mary Cummings, Executive Director of the Chicago Council on Fine Arts and Rose Farina, Coordinator of Programs and Exhibits, the Chicago Council on Fine Arts at the Daley Center, Defendants.**

**No. 79 C 4896.**

United States District Court,
N. D. Illinois, E. D.

Nov. 30, 1979.

---

David A. Goldberger, Barbara P. O'Toole, The Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., for plaintiff.

Daniel G. Welter, Asst. Corporation Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff John Sefick has brought this action challenging a decision by defendant Rose Farina to revoke permission to display certain of his sculptures at the lobby of the Richard J. Daley Civic Center in Chicago. Sefick alleges that the permit revocation violated his freedom of speech rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution. He seeks both injunctive and monetary relief.[1] On the date the complaint was filed, the plaintiff moved for a temporary restraining order to compel defendants to display his exhibit. This motion was denied on November 21, 1979.[2] Thereafter, on November 26, 1979, the Court held a consolidated proceeding at which the trial on the merits as well as an application for prelimi-

---

1. Federal jurisdiction against the City of Chicago, the Council on Fine Arts, and defendants Cummings and Byrne is premised on 42 U.S.C. § 1983, and the jurisdictional grant contained in 28 U.S.C. § 1343. The plaintiff also invokes the Court's jurisdiction under the declaratory judgment provisions of 28 U.S.C. §§ 2201–2202.

2. By granting a temporary restraining order at that stage of the litigation, the Court effectively would have rendered the issues in this case moot. The plaintiff's exhibit surely would have run for its scheduled period prior to the time when the Court could have issued a ruling on the merits. Conversely, the plaintiff could show no immediate and irreparable harm so as to justify the extraordinary remedy of a temporary restraining order.

nary injunctive relief was heard.[3] The facts as developed at trial are as follows.

John Sefick is an employee of the United States Probation and Parole Office. As an avocation, Sefick has done considerable work in the art genre known as "installation" or "environmental" sculpture.[4] Since 1968, Sefick has exhibited his works in a number of public and private establishments throughout the Chicago metropolitan area.

On October 24, 1978, Sefick wrote to Rose Farina of the Chicago Council on Fine Arts concerning the possibility of exhibiting his work at the Richard J. Daley Civic Center lobby for an exhibition of his work. Attached to this letter of inquiry were a listing of Sefick's prior exhibitions and a letter of reference from Cynthia Alton Fielding, Assistant Coordinator of Exhibits at the Chicago Public Library Cultural Center.[5] Sefick included neither a picture nor a description of the tableau he proposed to exhibit at the Daley Center.[6] Farina, who wields sole authority for the scheduling of programs and exhibits at the Daley Center, expressed interest in Sefick's offer.[7] In September, 1979, she notified Sefick that space in the Daley Center had been reserved for an exhibition of his work for the three weeks from November 5, 1979,

through November 23, 1979. At no time prior to the issuance of this permit did Farina request further information concerning the nature of the tableau Sefick proposed to exhibit at the Daley Center.

Shortly after Sefick learned that his proposal had been approved, he provided Farina with more detailed information about the exhibits so that the Council on Fine Arts could issue press releases to publicize the display. Sefick notified Farina that a different tableau would be used for each of the three weeks of the exhibition:

*First Week*

A Judge and his Court. Three life-size plaster figures arranged in a court setting. A Chief Judge, court reporter, and clerk are about to bring court to order.

*Second Week*

A Chicago Transit Authority passenger rides a Chicago subway car. This is also life-size with a tape recording.

*Third Week*

A Chicago portrayal of Grant Woods' famous painting American Gothic in plaster. The life-size figures are contemporaries of Chicago Society. Husband, wife and child make up the setting.

In this letter to Farina, Sefick also observed that "[m]ost of his works have a critical

---

**3.** Fed.R.Civ.P. 65(a)(2) provides in relevant part:

> Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

**4.** This art medium involves the placement of sculpted figures in tableaus. The figures may be made from a variety of materials, and may vary with respect to size, degree of caricaturization, and use of moving parts. Tape recordings are often used in these tableaus. It is common for such tableaus, both through the sculptures and recordings, to convey messages concerning social or political issues and events.

Sefick's numerous works are life-size, plaster cast models which usually are accompanied by tape recordings. Expert testimony by Jane Allen, editor of the New Art Examiner and an expert in Twentieth Century Art, established that Sefick's works are typical of the "environmental" sculpture genre.

**5.** Prior to his contract with Farina, Sefick had written to Fielding seeking permission to display his work at the Public Library Cultural Center. Although Fielding rejected Sefick's request due to a limited amount of available exhibition space, she recommended that he contact Farina about obtaining permission to exhibit his work in the Daley Center.

**6.** As indicated in Farina's testimony, the process by which exhibits are scheduled for display at the Daley Center is an informal one. There is no standard application form; artists merely contact Farina by letter with requests for exhibition space. Farina herself then determines what information she requires in order to render a decision on a proposed exhibit.

**7.** Farina testified that although she may receive suggestions from Commission members or their staff as to possible exhibits, she alone determines which proposed exhibits are given space at the Daley Center. She further stated that no decision of hers ever has been vetoed by the Mayor or by the Council on Fine Arts.

social commentary to them." Prior to the date of exhibition, Susan Fastwolf, an aide to Farina, tried to obtain additional information about the exhibit from Sefick. Sefick, however, testified that at the time he had not determined many of the details he would add to the tableaus. Accordingly, he was unable to further supplement the information he had provided Farina. Neither Fastwolf nor Farina insisted on more complete disclosure of the contents of the exhibit; nor did they demand to view the tableaus prior to their public display at the Daley Center.

On November 4, 1979, Sefick set up his tableau entitled "A Judge and his Court" in the area assigned to him in the Daley Center. The display varied from the description provided Farina in that the sculptures were accompanied by a tape recording satirizing the court system. The exhibit, however, remained on display from November 5 through November 10 without complaint either by the judiciary located at the Daley Center courtrooms, the general public, or the Council on Fine Arts.

On November 11, 1979, Sefick removed his "A Judge and his Court" display and set up in its place a tableau entitled "Chicago Transit Authority." This display varied from the prior description in that it was accompanied by a title. The tableau was also accompanied by a tape recording satirizing the problems often encountered by riders of public transportation. This exhibit was displayed from November 12 through November 17 without complaint.[8]

On November 18, 1979, Sefick removed the Chicago Transit Authority display and replaced it with the tableau scheduled for the third week, entitled "The Bilandics."

Sefick testified that not until the prior evening had he decided to include a tape recording with the exhibit. The sculptures, along with the tape recording, satirized the handling by then-mayor Michael Bilandic of the snow removal operation necessitated by the record snowfall that victimized the city of Chicago during the winter of 1979. The tableau depicted Bilandic seated in an easy chair with his wife, Heather, sitting on the arm of the chair. The tape recording continuously played the following statement:

> Heather, Heather, I think it is still snowing out there, Heather. I think it is still snowing. God, it must be around eight feet now, isn't it, Heather? At least eight feet. Maybe another log on the fire, Heather. Maybe another log on the fire. On the fire, another log on the fire, Heather. It is beginning to snow again. Another log on the fire, Heather. I think it is beginning to snow once again. My God, it must be eight feet out there now, Heather. I don't know what to do. What do you think we should do, Heather?[9]

Farina first saw the exhibit early on Monday morning, November 19. At the time, she had received no comments, positive or negative, concerning this tableau. Upon viewing the tableau, however, she contacted Sefick and informed him that it was unsuitable for display in the Daley Center and would have to be removed. Later that morning, Farina wrote a letter to Sefick reiterating her displeasure with the tableau and her desire that it be removed by the end of the day. Meanwhile, Farina placed a blanket over the exhibit to prevent others from viewing it.

---

8. On November 14, Sefick contacted Farina to inquire about the removal of the "Chicago Transit Authority" title from the tableau. Farina indicated that the sign had not been securely fastened in place, and she had removed it for fear that it might come loose and damage the sculptures. As a result of the conversation, the title was replaced in front of the tableau.

During the course of the conversation Sefick and Farina spoke about the progress of the exhibition. At no time during this conversation did Sefick provide additional information about

the tableau scheduled for the third week; nor did Farina demand that she be shown the tableau prior to the public display.

9. As reflected by Farina's testimony, many persons are of the opinion that Bilandic's handling of the snow removal operation contributed to his defeat in the Democratic mayoral primary in February, 1979. The Court, of course, expresses no view as to the correctness of that opinion.

In her letter to Sefick, Farina indicated that her decision to revoke the permit for the tableau display was based on the failure of Sefick to provide complete and accurate information about the nature of the display scheduled for the third week. In her testimony at trial, Farina noted three particular aspects in which the description was at variance with the tableau actually displayed: (1) there had been no prior indication that the exhibit would be titled; (2) there had been no prior indication that the exhibit would focus on a particular individual; and (3) there had been no prior notification that a tape would accompany the tableau. In addition, Farina testified that she found the tableau unsuitable for display because she believed it singled out particular individuals and subjected them to ridicule.

When first contacted, Sefick did not contest the decision to revoke his permit for the display. Later, however, he reconsidered his acquiescence to Farina's demand that the display be terminated. As a result, he retained counsel and filed this suit to compel the defendants to exhibit the tableau for the agreed upon period of time.

The plaintiff's position is quite straightforward. He argues that the artistic expression of social and political views is protected speech under the first amendment. Accordingly, the permit revocation, which the plaintiff contends was based on Farina's objection to the content of the third week's tableau, is unconstitutional. The defendants, on the other hand, assert that the issuance or revocation of a permit to display art is a discretionary decision that does not implicate first amendment concerns. Further, they assert that the decision was not based on the content of the display, but rather on the variance of the tableau with the earlier description provided by Sefick.[10] Thus, in determining the propriety of the revocation, the Court must first address two preliminary issues: (1) whether the first amendment applies to this revocation of Sefick's permit to exhibit his tableau; and (2) whether the revocation was based on the content of the tableau or on the failure of Sefick to inform Farina of the precise nature of the exhibit.

### A. Application of the First Amendment

■ The Court believes that the art form involved in this case constitutes speech within the meaning of the first amendment and thus is entitled to constitutional protection.[11] The exhibit consisted not only of figures depicting a fireplace scene but also included a tape recording of a conversation between the figures. The initial issue before the Court is whether the decision to revoke Sefick's permit to exhibit his work and subsequently cover the figures has first amendment implications.[12]

The public display area in the Daley Center has been voluntarily opened to art exhibits. The defendants were under no constitutional compulsion to provide this public

---

10. Other defendants in the case assert additional grounds for denying relief. Defendants Byrne and Cummings seek dismissal from the suit on the ground that at most they are only vicariously liable for Farina's actions and therefore are not subject to suit under the reasoning of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court notes that the complaint failed in any way to allege conduct which would subject these defendants to liability under *Monell*. Accordingly, the complaint is dismissed as to Byrne and Cummings. In addition, the parties have agreed to dismiss the Council on Fine Arts from this litigation. Therefore, the balance of this opinion will address the liability of the City of Chicago and Farina.

11. The concept of constitutionally protected speech has been expanded beyond the bounds of mere oral expression. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (theatre; rock-musical Hair), and *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (films), and *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (words and inscription on a jacket).

12. At oral arguments counsel for the plaintiff conceded that, although he disagreed with the state of the case law, it was his opinion that had the defendants initially refused the application by the plaintiff, a lawsuit based on that refusal could not properly have been brought. Due to the willingness of counsel on both sides to narrow the issues, the Court will not address this question.

forum. However, it is widely recognized that once this forum has been provided, constitutional guarantees come into play:[13]

> There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.

*Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

In those circumstances which do not involve obscenity, libel, speech calculated to create a clear and present danger to other individuals, or regulations involving the manner, time, and place of speech, a governmental entity ordinarily cannot select which issues are worth discussing or which views should be heard when public facilities are involved. *Id.* The Court disagrees with the defendant's contention that the permit is a mere license and thus revocable at will, even if the licensor is the government.[14] Once the defendants have opened up the forum and, as is the case here, given permission to display an exhibit, the plaintiff's right of expression cannot be "infringed by the denial of or placing conditions upon a benefit or privilege." *Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th Cir. 1976).

The fact that a governmental entity has no obligation to provide a forum but when it does is subject to constitutional mandates has been recognized and applied in a number of situations. In *Minarcini*, 541 F.2d at 582, the court found that once a library was created, the school board could not remove certain books without regard to constitutional guarantees:

> Neither the State of Ohio nor the Strongsville School Board was under any federal constitutional compulsion to provide a library for the Strongsville High School or to choose any particular books. Once having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members.

In another school-related case, *Right to Read Defense Committee of Chelsea v. School Committee of the City of Chelsea*, 454 F.Supp. 703 (D.Mass.1978), a school committee had ordered a teenage literary anthology removed from the library. The court found that the removal constituted an infringement of the students' first amendment rights:

> Clearly, a school committee can determine what books will go into a library and, indeed, if there will be a library at all. But the question presented here is whether a school committee has the same degree of discretion to order a book removed from a library.
>
> \* \* \* \* \* \*
>
> It is a familiar constitutional principle that a state, though having acted when not compelled, may consequentially create a constitutionally protected interest.

*Id.* at 711, 712.

The plaintiff's constitutional rights are involved in defendant's revocation of the permit and subsequent closing of the exhib-

---

13. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), held that a municipal board's rejection of an application to use a public forum due to the content of the play constituted an improper prior restraint under a system lacking in constitutionally required minimal procedural safeguards. Also relevant in this regard is *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), where the Supreme Court found that an anti-picketing statute violated the equal protection clause of the fourteenth amendment by discriminating in the use of a forum by allowing only those views which were found acceptable.

14. At trial, counsel for defendants argued that there "is a right in a party who is giving a permissive sponsorship to withdraw that sponsorship if they find this offensive. That the party happens to be a governmental entity that is giving the sponsorship is of no consequence and gives no greater rights to the artist being displayed under that sponsorship." In the light of *Mosley, supra*, note 13, this contention cannot be accepted by the Court.

it. The defendants have voluntarily provided a public forum and invited the plaintiff to display his form of art at a public facility. In doing so, a "constitutionally protected interest" has been created, an interest which must be accorded full first amendment protection. Thus, the cancellation of the Bilandic tableau exhibit is permissible only to the extent is passes muster under first amendment principles.

## B. Motive For Revocation of the Permit

As indicated above, the defendants argue that the revocation was based not on the content of the tableau, but rather upon the variance between the exhibit and the prior description given by Sefick. The facts as developed at trial, however, lead to a contrary conclusion.

First, it must be observed that the defendants overstate the degree of variance between the Bilandic tableau and the earlier description provided by Sefick. It is true that Sefick did not indicate that his portrayal of Grant Woods' painting, "An American Gothic," would depict the Bilandics. Nor did he indicate that the tableau would bear a title or be accompanied by a tape recording. Sefick's description, however, did state that the tableau would consist of "life-size figures [who] are contemporaries of Chicago Society." Clearly, this contemplated the identification of specified individuals in the tableau.[15] Moreover, Sefick had notified Farina that his works often contain critical social commentary. Thus, it is disingenuous for the defendants to assert that they were surprised that the third week's tableau contained political content, particularly since the first two tableaus displayed also contained social-political content.

Second, the evidence at trial indicated that both of Sefick's tableaus, displayed during the first two weeks, varied to some degree from the descriptions provided to Farina. The "Judge and his Court" exhibit contained a satirical tape recording, although prior communications between Sefick and Farina had not expressly stated that this would be the case. The "Chicago Transit Authority" tableau bore a title of the scene depicted, contrary to the prior description given. Despite these variations from the earlier description, the first two tableaus were allowed to remain on display for the full duration of their scheduled exhibition. Only the final tableau, "The Bilandics," was removed from display.[16]

The foregoing leads to the inescapable conclusion that Farina's decision to revoke permission for Sefick's final tableau was based predominantly, if not exclusively, on the content of that tableau. All of the displays varied from the prior description. All of them contained satirical or critical social-political commentary. Furthermore, the defendants had notice that the final week's tableau would identify specific individuals. The primary distinguishing feature between the third tableau and the first two exhibited was that the former tableau identified Michael Bilandic and satirized a purported attitude toward a Chicago snowstorm. It was on this basis that Farina decided to remove the exhibit from public view.[17] Therefore, it is this attempt to

---

15. If the identification of particular individuals was contrary to the policy of the Council on Fine Arts, then Farina could have denied permission to exhibit the tableaus before November 19. It should have been irrelevant that the Bilandics, rather than some other less well-known couple, were to be identified by the tableau. The fact that Farina did not cancel the exhibition until she learned that the tableau identified the Bilandics suggests that in fact there is no general policy against the identification of individuals.

16. In her testimony, Farina suggested that the failure by Sefick to provide complete information justified revocation of the permit because

it denied her the information necessary to make a judgment as to "logistics." She failed, however, to specify precisely what difficulty she encountered as a result of the incomplete information. Moreover, she failed to explain why the incomplete information with respect to the first two tableaus did not require cancellation of the exhibition as well. The Court must conclude that concern for "logistics" played no role in Farina's determination to remove the exhibit from display.

17. Farina herself admitted as much during her testimony. She stated that she found the Bilandic tableau inappropriate because it singled out identifiable individuals for ridicule, and that

regulate the content of the display that must be judged under first amendment principles.

## C. Permissibility of the Revocation

■ The deep-rooted traditions of the first amendment reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even though such speech "may well include vehement, caustic, and sometimes unpleasantly sharp" comments. *New York Times Company v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). To effectuate this commitment, the first amendment must be sufficiently broad to curtail government restriction of expression "because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Thus, "[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Mosley*, 408 U.S. at 96, 92 S.Ct. at 2290. This does not mean, of course, that the government is completely powerless to regulate speech. Rather, it requires the government to show that the regulation is in furtherance of a substantial governmental interest, and not merely the product of disagreement with the message of the speaker. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 67–68, 96 S.Ct. 2440, 2450–2451, 49 L.Ed.2d 310 (1976); *Mosley*, 408 U.S. at 98–99, 92 S.Ct. at 2291–2292. In this case, it is evident that the cancellation of the exhibition was based on Farina's objection to the social-political content of the Bilandic tableau. Without more, the defendants' actions would violate the first amendment. The defendants, however, contend that cancellation was necessary to serve other important governmental interests.

The defendants argue that cancellation of the exhibition was justified under the "captive audience" theory. They assert that since the tableau was placed in a heavily-trafficked corridor in a public building, the defendants legitimately could act to protect unwitting passers-by from the objectionable message. In support of this view, defendants cite *Close v. Lederle*, 424 F.2d 988 (1st Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970). There, the defendant university had invited an artist to exhibit his works in a Student Union corridor. Due to the sexual explicitness of the paintings, however, the university cancelled the exhibit on the fifth day of a scheduled 24-day display. The court approved this action, finding that the defendant had the right to protect the captive audience which regularly passed through this corridor against this " 'assault upon individual privacy.' " *Close*, 424 F.2d at 990.

This Court, however, does not find *Close* to be persuasive precedent. The *Close* decision preceded the analysis in *Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971), in which the Court limited application of the captive audience theory to those instances in which "substantial privacy interests are being invaded in an essentially intolerable manner."[18] The facts of *Close* are such that the action of the university might well be justifiable even in light of *Cohen*. The situation presented by the instant case, however, is distinguishable from *Close* in several re-

had she known of the content of the exhibit from the outset, she never would have approved Sefick's proposal.

**18.** In that case, the Court reversed Cohen's conviction for breach of the peace based on his strolling through a Los Angeles courthouse while wearing a jacket bearing the inscription "Fuck the Draft." The Court held that

if Cohen's "speech" was otherwise entitled to constitutional protection, we do not think the fact that some unwilling "listeners" in a pub-

lic building may have been briefly exposed to it can serve to justify this breach of the peace conviction where, as here, there was no evidence that persons powerless to avoid appellant's conduct did in fact object to it, and where that portion of the statute upon which Cohen's conviction rests evinces no concern . . . with the special plight of the captive auditor . . . .

403 U.S. at 22, 91 S.Ct. at 1786.

spects.[19] The sexual explicitness of the message in *Close* implicated far more serious privacy interests than does the social-political message conveyed by Sefick's tableau.[20] Furthermore, the manner in which Sefick conveyed his message was far less intrusive than was the case in *Close*. In that case, the large-scale depiction of genitalia in a corridor made it difficult for passers-by to avoid viewing this sensitive subject. Here, the most objectionable part of the exhibit is probably the tape portraying a hypothetical conversation between the Bilandics concerning the snowfall last winter. Given the size and acoustical nature of the Daley Center, it is unlikely that the tape recording would be heard except by those who sought to listen to it.[21] *See Packer Corporation v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643 (1932). In light of the foregoing, the Court concludes that the captive audience theory cannot justify the cancellation of the exhibit in this case.[22] *Gambino v. Fairfax City School Board*, 429 F.Supp. 731, 735 (E.D.Va.), aff'd, 564 F.2d 157 (4th Cir. 1977).

Defendants also assert that cancellation of the exhibit was necessary to prevent the impression that the City of Chicago had adopted the message conveyed by Sefick's tableau. According to Farina's testimony, the purpose of the Daley Center program is to "turn a public building into a living building by encouraging the art community of Chicago, performing the visual artists, to exhibit or perform." Farina indicated, however, that her acceptance of an artist's proposal to display his or her work never has been viewed as an endorsement of any substantive messages contained in the art. Indeed, Farina at no time expressed concern that the critical satires of the judiciary system or of the Chicago Transit Authority contained in Sefick's first two tableaus would be thought to represent official city viewpoints. Thus, the Court finds this "sponsorship" theory inadequate to support the cancellation of the exhibit. *See Gambino v. Fairfax City School Board*, 429 F.Supp. at 736.

Finally, the defendants urge that the power to cancel exhibits such as the Bilandic tableau is necessary if the city is to be able to avoid suits for slander and libel. In closing argument, however, counsel for the defendants disavowed any contention that the message contained in the Bilandic tableau was libelous.[23] The Court cannot accept the proposition that cancellation of this

19. Initially, it should be noted that in *Close* the court found that there was "no suggestion . . . that plaintiff's art was seeking to express political or social thought." 424 F.2d at 990. In light of this finding, the court considered plaintiff's constitutional interest in his speech minimal. On the other hand, it is clear in this case that *Sefick's* tableau of the Bilandics possessed social-political content; indeed, content was the motivating factor in the removal of the exhibition.

20. Farina's testimony indicated that she received no complaints about the tableau prior to her cancellation of the exhibition. This brings the case within the *Cohen* reasoning, in which the court found it relevant that there had been no complaints about the message emblazoned on Cohen's jacket.

21. Farina's actions in revoking the permit and covering the sculpture has predictably proved counter-productive to her stated desire to limit the viewing of the sculpture. Her suppression of the exhibition has created the attendant media publicity which undoubtedly has caused more persons to learn of the sculpture and has fostered wider dissemination of the message contained in plaintiff's art work than there would have been had she permitted the exhibition to run its course.

22. Indeed, the evidence suggests that the cancellation of the exhibit was motivated more by Farina's concern for the privacy interests of the *Bilandics* than by concern for a captive audience of public passers-by. It is questionable even whether the Bilandics share Farina's concern. They have heard and read much harsher words about themselves than the rather benign criticism suggested by plaintiff's sculpture. Significantly, the Bilandics have not objected to Farina or to other city officials as to the showing of the exhibit. Nor have they sought to intervene in this law suit.

23. The plaintiff has urged the Court to find that the Bilandics are public figures within the meaning of *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In view of the fact that defendants have abandoned the argument that Sefick's display was libelous, the Court declines to express an opinion on this issue.

admittedly non-libelous [24] art tableau is necessary to preserve the city's right to cancel future exhibits which may be libelous. This position conflicts with the first amendment maxim that any regulation of speech, to be permissible, must be narrowly drawn. *Mosley*, 408 U.S. at 99, 92 S.Ct. at 2292. Therefore, the Court must reject this proposition as a basis for cancelling Sefick's exhibition.

### Conclusion

Plaintiff's sculpture is protected by the first amendment. Defendants have revoked permission to exhibit the sculpture because of their apparent objection to the social and political nature of the art work. By cancelling the exhibition at the lobby of the Richard J. Daley Civic Center, defendants have violated plaintiff's first amendment constitutional rights.

For this reason, the Court finds in favor of the plaintiff John Sefick and against defendants Rose Farina and City of Chicago. Judgment is entered on this finding. Pursuant to this judgment, it is ordered that defendants exhibit plaintiff's sculpture for five consecutive days at the Daley Civic Center lobby in the same manner and place as was exhibited at the time of its covering by defendants, that this exhibition be scheduled within the next 60-day period, and that defendants notify plaintiff within 10 days as to the dates scheduled for exhibition in accordance with this order. It is further ordered that defendants exercise all due care in handling plaintiff's sculpture before, during, and after exhibition.

---

24. As noted above, any message of ridicule or satire contained in plaintiff's sculpture is exceedingly mild. Mayor Bilandic not only is the immediate past mayor but is currently active politically. Political cartoons and satirical commentary by newspaper columnists and television commentators as to prominent political personalities generally and as to Mayor Bilandic particularly make plaintiff's sculpture by comparison appear to be almost good-natured ribbing.