John SEFICK, Plaintiff,

v.

Richard GARDNER, et al., Defendant.

No. 97 C 1539.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 12, 1998.

Edward M. Fox, Shefler & Berger, Ltd., Chicago, IL, for plaintiff.

Matthew D. Tanner and Thomas P. Walsh, Assistant U.S. Attorneys, Chicago, IL, for defendant.

## ORDER

LOZANO,* District Judge.

This matter is before the Court upon conclusion of a bench trial. For the reasons set forth below, the Clerk is **ORDERED TO**

---

* Of the N.D. of Indiana, sitting by designation.

**ENTER JUDGMENT** forthwith for Defendants and against Plaintiff, denying Plaintiff injunctive relief and all other relief, and dismissing this case with prejudice.

*BACKGROUND*

Plaintiff, John Sefick, has created a sculpture of the Honorable Brian Barnett Duff of the Northern District of Illinois. Sefick would like to use the lobby of the Dirksen Federal Building in Chicago to display the piece. The Dirksen Building contains federal courts, including the courts of the Northern District of Illinois. Sefick is suing three present or former administrators of the General Services Administration ("GSA") in their official capacities, alleging that they violated his First Amendment rights by denying him permission to display his work. The case was assigned by designation to the undersigned, a judge of the Northern District of Indiana, Hammond Division.

Defendants assert that they were entitled to reject Sefick's sculpture because the Dirksen Building lobby is a nonpublic forum and their decision was reasonable and not viewpoint discrimination. In addressing Defendants' summary judgment motion, the Court ruled that the lobby is a nonpublic forum. However, the issues of reasonableness and viewpoint discrimination were left for trial.

The parties agreed to a bench trial. At the request of the parties, the trial was held in Chicago at the Dirksen Building.

Sefick seeks only an injunction allowing him to display his sculpture; he does not seek damages. No one has contested that Sefick's sculpture constitutes expression that is generally protected under the First Amendment.

*FINDINGS OF FACT*

Sefick is a retired federal probation officer who worked with the judges of the Northern District of Illinois, including Judge Duff. He is also an artist who creates sculptures that he intends to be satirical and that feature prominent people who are currently in the public eye. Sefick prefers to place his sculptures in environments where they will have maximum impact, and he has placed sculptures in federal buildings before. Sefick applied to have these past sculptures and his current sculpture displayed under the federal Public Buildings Cooperative Use Act ("Act").

Past examples of work Sefick has placed in federal buildings include a piece depicting the actor Telly Savalas as a "Toxic Avenger." With GSA's permission, Sefick placed this piece in the Metcalf Federal Building, which houses EPA offices. Also with GSA's permission, in February 1995, Sefick placed a previous sculpture of Judge Duff in the Dirksen Building lobby. That piece depicted the judge on the bench "tongue lashing" someone. Then, a mannequin representing the model Cindy Crawford entered the room holding a briefcase and wearing a miniskirt. An audio tape portrayed Judge Duff as speaking rapidly. The mannequin of Crawford acted as if "standing her ground," with a look of, "Who *is* this guy?" (Ex. 3)

The sculpture involved in this case consists of a life-sized rendering of Judge Duff sitting astride a white horse. The horse is not natural in appearance or proportion. It has an elongated neck, eyes looking upward with exaggerated whites, legs without visible joints, and squared-off shoulders, haunches, and chest. Judge Duff appears to be smiling and is holding the reins. The piece is eight feet tall and takes up floor space of about five feet by eight feet. It weighs about 400 pounds.

Sefick actually applied twice to display two different versions of this sculpture in the Dirksen Building lobby. As first proposed in August 1996, the sculpture incorporated a tape recording that identified the rider of the horse as Judge Duff and contained a voice representing Judge Duff's commenting on his rulings being overturned "upstairs." Sefick applied in writing to display the sculpture for two weeks. Sefick believes that whether the sculpture could have been viewed as commenting on the relationship between a district judge and the court of appeals was a matter of interpretation. At the time of his first application and the second one described below, Judge Duff was the subject of controversy and media attention. (The evidence at trial did not say more about what kind of controversy or attention.)

About two weeks after Sefick submitted this first application, Defendant, Richard Gardner, sent a letter to Sefick notifying him that the application was denied. At the time, Gardner was a GSA property manager whose duties included reviewing permit applications under the Act for the Dirksen Building. The denial letter offered the following reasons:

First, as you are aware, there is extensive construction activity occurring in the building's lobby area. I do not want to cause the construction workers or the pedestrians in the lobby any more unwarranted obstructions than are necessary. All Applications are being critically reviewed due to the above. Title 5, C.F.R. Section 101–20.403(a)(3) serves as the basis for this denial.

*The second basis for denial of your Application/Permit is contained in Title 5, C.F.R. Section 101–20.403(a)(4). I am concerned that your art exhibit, which includes an accompanying recorded message of Judge Duff may be construed as an attempt to influence judicial proceedings in either the U.S. District Court or the U.S. Court of Appeals for the Seventh Circuit.*

(Ex. 4)

At the time of this letter, significant construction activity was indeed occurring in the Dirksen Building lobby. New glass was being installed, a two-year project that disrupted the entire lobby. Panes of glass twelve feet tall were being moved around the lobby. At different times, different areas of the lobby would be the focus of the construction. The workers in the lobby numbered ten to fifteen. Also, safety shields were placed by the elevators to direct persons to magnetometers.

Gardner believed that placing Sefick's display amidst the construction activity would endanger the safety of construction workers and pedestrians in the lobby, or inconvenience the workers and pedestrians, or both. The "critical review" the denial referenced meant that Gardner paid special attention to how long a display would last, and whether the sponsor of the display was a tenant or nontenant of GSA. Gardner believed that tenant displays were less problematic be-

cause it was easier to get a tenant to move or reschedule a display on short notice if needed to accommodate the construction.

Regarding influence of judicial proceedings, Gardner's beliefs were less concrete. When he first reviewed Sefick's application, he had a vague sense that the sculpture might cause problems in some proceeding because Judge Duff had been the subject of controversial media attention. So, Gardner referred the application to legal counsel. Counsel actually wrote the denial letter. Gardner reviewed the letter, found it agreeable, and signed it. However, Gardner himself did not think through the "influence" rationale in any detail.

Gardner did not know what message the sculpture was intended to convey. Specifically, he did not know if the sculpture was positive or negative toward Judge Duff, or positive or negative toward the court of appeals.

Besides the reasons in the letter he signed, Gardner also thought the sculpture might present a security risk in light of the April 1995 bombing of the Murrah Federal Building in Oklahoma City. However, he did not have a firm sense of just how the sculpture would threaten security.

Within days, Sefick appealed Gardner's decision to Defendant, Robert Duffer, another GSA property manager. In his appeal letter, Sefick stated that he believed he could work with Gardner to find a suitable place in the lobby where the sculpture would not interfere with pedestrian traffic or the construction workers' activities. Sefick also stated that he did not understand how the sculpture could be viewed as an attempt to influence judicial proceedings. Sefick added as follows: "The A.C.L.U. has had contact with Paul Maxse, Esq., Office of Regional Counsel, General Services Administration on my behalf concerning first amement [sic] rights pertaining to these lobbies. I hope this deniel [sic] does not mark a turn around on what I believe has been an understanding." (Ex.5)

Several days later, Duffer affirmed Gardner's denial by letter. Duffer stated that he had carefully reviewed Gardner's reasons

and agreed with them. Duffer also offered to allow Sefick display space in the nearby Metcalf Building, which does not contain court facilities. (Ex.6)

Regarding construction, Duffer was aware of the activity in the Dirksen Building lobby. Regarding influence of proceedings, Duffer knew what the sculpture depicted and what the tape would say. He did not wholly understand what message the sculpture was meant to convey. However, he did think the tape was derogatory toward a presiding judge because it suggested that the court of appeals was overturning all of Judge Duff's rulings. Duffer believed the derogatory content had a chance, albeit a remote chance, of influencing proceedings. He thought that a juror walking through the building might see the sculpture and not know who sponsored it. He thought the sculpture thus might influence the juror in a negative way, especially if the juror was serving in a case presided over by Judge Duff.

Like Gardner, Duffer thought the sculpture might present a security risk, although he did not say so in his letter. He thought courthouses were a major security concern. He also thought that all federal buildings had heightened security concerns after the Oklahoma City bombing. He was concerned that Sefick's sculpture might create a security threat by bringing increased public traffic to the Dirksen Building. Duffer thought the piece would be less of a security threat in the nearby Metcalf Building because it does not house courts, does not attract a lot of public traffic, and has good security. Duffer also knew that previously in the Dirksen Building, a hostage situation had occurred and a prisoner had been shot. Actually, security was Duffer's largest concern with respect to Sefick's sculpture.

About a month after Duffer's affirmance, Sefick wrote to Gardner offering to change the sculpture to overcome concerns expressed regarding potential influence of proceedings. Sefick stated:

I have thought of a way to overcome our differences with the Judge Duff Sculpture. Since Judge Duff has resigned I would change the recording to play "Don't Cry for me Argentina" the theme song of Evi-

ta. I think even the powers that be would have to "reach" to see how this Sculpture with that music would influence "judicial proceedings". You know I kind of liked Judge Duff because he never conformed so I think these changes will make the whole thing very benign and acceptable. The Sculpture will not even mention his name.

(Ex. 7) By these changes, Sefick intended to lend a resignation theme to the piece. However, Sefick did not expressly identify this theme in his letter, nor does the evidence show that he identified it in any other way to any Defendant or GSA official.

Gardner did not respond to this letter, but another GSA official sent Sefick a letter offering him display space in the Metcalf Building. Sefick was reluctant to use that space because the Metcalf Building does not contain court facilities and thus was not the type of display environment he wanted. Nonetheless, Sefick placed his sculpture in the Metcalf Building for the full two weeks he had originally requested. He placed a sign on the piece that said, "See Art Censored by GSA"; he had not mentioned any such sign in his application. At one point, building workers moved the sculpture after giving Sefick only one day to do so. Also, while in the Metcalf Building the sculpture was damaged; the Court cannot determine from the evidence who damaged it.

In the meantime, Defendant, Donald Zbylut, had taken over Gardner's position and the responsibility for reviewing applications under the Act. Gardner and Zbylut had spoken about Sefick's sculpture. Gardner told Zbylut that he thought Sefick would keep trying to gain permission to display the piece. According to Zbylut, Gardner "probably" told him that the courts were opposed to the sculpture because it was an embarrassment to Judge Duff. Zbylut believed that Chief Judge Marvin Aspen of the Northern District of Illinois was concerned about displays that could impede judicial proceedings.

In January 1997, Zbylut replied in writing to a letter from Sefick's then-current attorney. Zbylut told the attorney that Sefick's previous application had expired and requested a new application. Sefick submitted the

requested application several days later; this application proposed the second version of the sculpture, the one with the tape of the "Evita" song and which did not refer to Judge Duff. Sefick asked to display the sculpture in the Dirksen Building lobby during February 17–March 8, 1997.

Zbylut consulted with legal counsel, and about two weeks later, he denied the application in a letter to Sefick. Legal counsel wrote the letter and Zbylut signed it. Specifically, the letter stated that Zbylut approved the application, but only for the Metcalf Building. (Sefick ultimately decided not to place his piece in the Metcalf Building a second time.) The letter gave the following reasons for not allowing Sefick to use the Dirksen Building lobby:

The Dirksen Federal Building lobby is currently undergoing extensive construction activity along the entire first floor lobby area. Several weeks ago there was a significant work accident associated with the construction. I do not want to cause the construction workers and the lobby users any further unwarranted disruptions during this period. In addition, you should be aware that the entire Dirksen facility is presently undergoing a security evaluation as a result of threats that have been made to certain of the building's tenants. This matter is considered extremely serious. We are evaluating the future use of the lobby for displays and other activities in light of security and other tenant concerns. I am not approving any Applications for use of space in the building until these concerns are fully addressed. GSA has advised a federal employee association and a local university who have made Applications of the above position. Both of the above activities have been accommodated in alternate space.

(Ex. 11)

At the time of this letter, there was significant construction activity in the lobby. Also, GSA officials were evaluating Chief Judge Aspen's request to ban all lobby displays as a security measure. What any final policy on displays might be was a subject of discussion, but no firm and wholly agreed policy had been set. Zbylut was aware that the discussions were happening, but others higher up in GSA would have been final decisionmakers on what policies GSA would endorse. The discussion on the security concerns raised by lobby displays had nothing to do with the subject or viewpoint of any display. Zbylut decided to go along with what the letter said about not approving any displays until the higher-ups decided what they were going to do.

Unlike Gardner's denial, Zbylut's letter did not mention influence of proceedings as a reason for denying Sefick's application. Zbylut did not consider the subject matter or viewpoint of the sculpture in rejecting it. Zbylut knew that Sefick's sculpture depicted a rider on a horse in a judge's robe and was accompanied by a tape playing "Don't Cry For Me Argentina." He knew the sculpture did not identify Judge Duff by name. Zbylut did not know what message the piece was meant to offer. He did not know what comment on the judiciary it might have made. In Zbylut's mind, the sculpture offered no clue as to what it was supposed to mean.

GSA did allow some activities in the Dirksen Building lobby during and around the time that Sefick was seeking to place his sculpture there. On May 17, 1996, a one-day health fair sponsored by a GSA tenant was approved by one of Gardner's assistants to be held on October 9, 1996. On September 6, 1996, a six-hour display by the U.S.D.A. graduate school, a GSA tenant, was approved by one of Gardner's assistants to be held on October 22, 1996. The display involved setting up two tables in the lobby. On November 5, 1996, a three-day computer expo sponsored by a GSA tenant was approved by Zbylut to be held November 5–7, 1996. The expo was expected to involve three hundred people. On August 12, 1996, a one-day blood drive sponsored by a GSA tenant was approved by one of Gardner's assistants to be held on January 27, 1997. The drive was expected to involve one hundred people. On February 3, 1997, a five-day children's art exhibit sponsored by a GSA tenant was approved by one of Zbylut's assistants to be held February 24–28, 1997. The exhibit was expected to involve one hundred people. On December 18, 1996, a one-hour press confer-

ence sponsored by a group with no connection to GSA was approved by one of Zbylut's assistants to be held on December 19, 1996. Finally, on March 26, 1997, a photographer not connected to GSA was approved by one of Zbylut's assistants to take photos on March 27, 1997, for no more than one hour.

Because of the construction, Gardner would not have approved the activities the assistants approved, except maybe the one-hour press conference. Gardner's assistants had some authority to approve the activities they did, but a lack of communication between Gardner and the assistants sometimes resulted in the assistants taking actions Gardner would not have approved. Likewise, Zbylut expected his assistants to consult with him before permitting activities in the lobby, the assistants did not always do so, and Zbylut would not have approved the children's art exhibit. The reason why Zbylut approved the relatively large computer expo but not Sefick's sculpture was because the expo was sponsored by a GSA tenant. As for Duffer, he thought that tenants are not even subject to the Act, and use Act-oriented application forms only for the internal purpose of reserving space.

Finally, no Defendant rejected Sefick's sculpture because he disapproved of its viewpoint, or because any other person who disagreed with the viewpoint pressured the Defendant to reject the sculpture.

### CONCLUSIONS OF LAW

■ The precise nature of Sefick's right to use the lobby turns in large part on what type of forum the lobby is. Three types are possible. First is the traditional public forum, "property that has traditionally been open to the public for expressive activity, such as public streets and parks." *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion). The second forum type is the "limited or designated public forum," which is "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for discussion of certain subjects." *Johnson v. City of Fort Wayne,* 91 F.3d 922, 941 (7th Cir.1996) (quot-

ing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). The third forum type is the nonpublic forum, an area that government "may reserve ... for its intended purposes," and " to which the government may control or limit access." *Johnson,* 91 F.3d at 922 (quoting *Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

■ In deciding Defendants' summary judgment motion, the Court ruled that the Dirksen Building lobby is a nonpublic forum. Therefore, Defendants may keep "identifiable subjects or speakers" out of the lobby if doing so is reasonable and "viewpoint neutral." *Johnson,* 91 F.3d at 941.

■ An official's "decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808. Reasonableness does not require the government to establish that the subject of speech is strictly incompatible with the forum. *Id.* In sum, reasonableness allows government "exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius,* 473 U.S. at 811. Reasonableness "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809.

■ Even having "reasonable grounds for limiting access to a nonpublic forum ... will not save" a refusal of access "that is in reality a facade for viewpoint-based discrimination." *Id.* at 811. Although viewpoint-discrimination is impermissible, subject discrimination is permitted. So, Defendants may restrict speech in the Dirksen Building lobby based on the subject of the speech—they may choose to allow speech on some subjects, but not on others. However, Defendants may not pick and choose among viewpoints within a subject. *See Grossbaum v. Indianapolis–Marion Cty. Bldg.,* 100 F.3d 1287, 1297 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *Johnson,* 91 F.3d at 941. For example, GSA might properly ban courthouse

speech on the subject of abortion, but it could not ban speech advocating one viewpoint on the abortion debate while allowing speech on another. The often crucial "line between viewpoints and subjects is ..." an elusive one." *Grossbaum*, 100 F.3d at 1298.

■ Upon the Court's request, before trial the parties briefed who bears the burden of proof on reasonableness and viewpoint. At trial, the Court delivered a brief oral ruling placing the burden on Defendants. The Court now states in more detail the reasons for that ruling.

The parties' efforts and the Court's have not turned up any precise and binding authority. Still, what authority exists points in the direction of placing the burden on Defendants. In *Cornelius*, the Supreme Court encountered a nonpublic forum and accordingly addressed whether government restrictions on speech were reasonable. In so doing, the Court's perspective seemed to be one of testing whether the government had shown that its restriction was reasonable, not whether the party seeking access to the forum had shown the opposite. *See Cornelius*, 473 U.S. at 806–11. The Court specifically noted that the "record supported" the government's "position" and "inference[s]" favorable to the government. *Id.* at 810. Speaking more specifically, one district court has concluded that the government bears the burden of proof on viewpoint neutrality, although that court relied on authority offering only tangential support. *We the People, Inc. of the U.S. v. Nuclear Regulatory Comm'n*, 746 F.Supp. 213, 219 (D.D.C.1990). In cases involving traditional and designated public forums, the government clearly bears the burden of "show[ing] that its regulation is necessary to serve a compelling state interest

and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. Granted, in a nonpublic forum the government's reasons for restricting speech are not subject to such strict scrutiny. Still, it makes sense to give the government the burden of showing the validity of its justifications in a nonpublic forum case—precious First Amendment rights are at stake, and we generally presume that the government cannot infringe on such rights without affirmatively demonstrating an adequate reason.[1]

Only one case has been identified that lends support for placing the burden on Sefick. In passing, the Seventh Circuit has perhaps suggested that the plaintiff bears the burden on viewpoint discrimination. In affirming a grant of summary judgment, the *Johnson* court noted that the plaintiff had "simply failed to introduce any evidence" to allow an inference that his access to a nonpublic forum had been limited solely to suppress his viewpoint. 91 F.3d at 942. Of course, this remark warrants careful consideration. However, this Court views the remark as a general comment on a weak case, not a directive to place the reasonableness and viewpoint burdens on plaintiffs in all cases. In sum, in light of what authority exists, the Court must conclude that Defendants bear the burden of showing that their decision to reject Sefick's sculpture was reasonable and not meant "to suppress the point of view" the sculpture "espouses on an otherwise includable subject." *Cornelius*, 473 U.S. at 806.

■ As alluded to above, Sefick's applications were processed under federal statutory and regulatory provisions. Under the Public Buildings Cooperative Use Act, 40 U.S.C. §§ 490, 601a, 606, 611, 612a ("the Act"), the

---

1. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n. 6, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (noting that "presumptive invalidity" of content-based speech restrictions still "leave[s] room for such exceptions as reasonable and viewpoint-neutral content-based discrimination in nonpublic forums"); *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547 (7th Cir.1986) ("[T]he proponent of an ordinance that allegedly infringes upon ... First Amendment rights ... has the burden of establishing that the statute is constitutional"); *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir.1992) (stating that the

government bears the burden of establishing reasonableness of a content-neutral regulation of speech in a public forum); *TJ's South, Inc. v. Town of Lowell*, 895 F.Supp. 1124, 1129 (N.D.Ind.1995) (noting that prior restraints on speech "face a heavy presumption that they are unconstitutional"); *cf. Thornburgh v. Abbott*, 490 U.S. 401, 414 n. 12, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (declining to address whether a district court had been correct in shifting the burden between plaintiffs and defendants in a case challenging prison officials' screening of publications received by inmates).

administrator of GSA is authorized to "make available, on occasion, ... auditoriums, meeting rooms, courtyards, rooftops, and lobbies of public buildings to persons, firms, or organizations engaged in cultural, educational, or recreational activities ... that will not disrupt the operation of the building." 40 U.S.C. · § 490(a)(17); *Claudio v. United States*, 836 F.Supp. 1219, 1221 (E.D.N.C. 1993), *aff'd*, 28 F.3d 1208 (4th Cir.1994). "Cultural activities" includes "film, dramatic, dance, and musical presentations, and fine art exhibits." 40 U.S.C. § 601a(a)(4).

The administrator has promulgated regulations that allow persons desiring to use public property to apply for a permit to do so. 41 C.F.R. § 101–20.401(a). The applicant must submit a written application identifying himself or herself and any organization sponsoring the proposed activity, and describing the proposed activity, including the desired dates and times. *Id.* § 101–20.401(b); *Claudio*, 836 F.Supp. at 1221. If an application is denied, the applicant may appeal within GSA. 41 C.F.R. § 101–20.404(a); *Claudio*, 836 F.Supp. at 1221.

An application will be denied if "the proposed use interferes with access to the public area, disrupts official government business, interferes with approved uses of the property by tenants or by the public, or damages any property; [or] ... is intended to influence or impede any pending judicial proceeding." 41 C.F.R. § 101–20.403(a)(3) & (4); *Claudio*, 836 F.Supp. at 1221. Defendants cite this provision as supporting their decision to deny Sefick's applications to display his sculpture in the Dirksen Building lobby.

Specifically, Defendants assert that they denied the applications for three reasons, none of which had anything to do with suppressing the viewpoint expressed in the sculpture. First, Defendants state that Sefick's display would have interfered with ongoing construction and made the lobby unsafe. Second, Defendants cite security concerns that have arisen in all federal buildings in the wake of the Oklahoma City bombing. Third, Defendants were concerned that the sculpture as first proposed (with the taped voice representing Judge Duff's) could be viewed as "intended to in-

fluence or impede ... pending judicial proceeding[s]." 41 C.F.R. § 20.403(a)(4).

Sefick argues that these reasons do not hold water and are pretexts for viewpoint discrimination. He alleges that Defendants rejected his sculpture because of the viewpoint it offers, a viewpoint Defendants thought would be embarrassing to Judge Duff.

 More specifically, Sefick attempts to show that the construction concern was a pretext by stressing that other activities were allowed in the lobby during the time that he sought access. Yet the evidence showed that Defendants had legitimate and reasonable explanations for allowing those activities but not Sefick's sculpture. While the lobby was under construction, Defendants preferred activities sponsored by GSA tenants of short duration, so that disruption would be minimized and activities could be relocated or rescheduled easily if needed. Generally, the activities approved fit this bill. None lasted more than five days; some lasted only part of one day. The two activities not sponsored by a GSA tenant each lasted an hour. In contrast to the allowed activities, Sefick, who was not affiliated with GSA, proposed a 400–pound sculpture to be displayed for two weeks. Any perceived inconsistencies between the Defendants' stated preference for short, tenant-sponsored activities and the activities actually approved were satisfactorily explained as departures from the chain of command between Gardner, Zbylut, and their assistants, or based on the particular nature of the activity approved.

The Court recognizes that Sefick might be able to poke some holes in the logic of Defendants' construction rationale. Perhaps Defendants did not always act consistently. Perhaps the activities Defendants did allow presented something of a safety risk and inconvenience themselves. Perhaps if Defendants had bent over backwards, they could have found a safe and convenient way to accommodate Sefick's piece. But the First Amendment does not require that officials who run nonpublic forums be consistent managers, safety experts, or unfailingly accommodating. *See Cornelius*, 473 U.S. at 808 (noting that officials may deny expression

even if it is not strictly incompatible with a forum). Rather, all the officials must do is act reasonably, and not to suppress a viewpoint.

Sefick also asserts that the security concern was not legitimate, a pretext. However, substantial unrebutted testimony indicated that at all relevant times, security was a serious concern in all federal buildings and especially those housing court facilities. Moreover, Duffer genuinely believed that Sefick's display could present a security risk by increasing public traffic in the Dirksen Building.

Sefick has attacked Zbylut's citing security as insincere. Zbylut agreed with the point in the letter he signed that the best thing to do while higher-ups were formulating a security policy on lobby displays was to not approve any displays. Granted, in doing so, Zbylut appeared motivated more by bureaucratic politics than his own personal concern with security. Still, his action was reasonable in light of the security debate going on above him and not motivated by a desire to suppress the viewpoint of Sefick's piece. Indeed, the general debate about banning lobby displays for security reasons had nothing to do with the viewpoint or subject of any display. The Court is mindful that after Zbylut's letter stating that he had decided not to approve any use of lobby space, two other activities were approved. But Zbylut's assistants approved them, not Zbylut.

Sefick also attacks Defendants' influence-of-proceedings rationale. He maintains that calling the sculpture capable of "influenc[ing] ... pending judicial proceeding[s]" is a stretch. 41 C.F.R. § 20.403(a)(4). He also stresses that Defendants have not identified any specific, then-ongoing proceeding that the sculpture might have influenced. These points are largely semantic ones regarding whether Defendants' decision fits under the precise terms of the regulation. Yet Sefick has not sued for violation of the regulation, but for violation of the First Amendment. Whether the regulatory language required Defendants to pinpoint a specific ongoing proceeding as capable of being influenced by Sefick's sculpture is a question of what the regulation requires, not what the First Amendment requires.

Of course, Sefick suggests that if Defendants applied the regulation's terms expansively, that shows they were using the regulation to hide a censorship agenda. Yet regardless of how well Sefick's sculpture fits under the regulatory concept of potential "influence," it fits sufficiently under a concept more relevant for present purposes.

■ To dispense fair and effective justice, decorum must be maintained in a courthouse. Indeed, "it is proper to weigh the need to maintain the dignity and purpose of a public building" when considering a citizen's right to use the building for expression. *Kokinda,* 497 U.S. at 738 (Kennedy, J., concurring) (citing *United States v. Grace,* 461 U.S. 171, 182, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

For the benefit of all citizens, cases must be heard in a dignified environment that impresses upon the participants the seriousness and importance of proceedings, and the need to follow the rules of deliberation, decision, and personal behavior that the trial judge supplies. This vital interest in courthouse decorum is most emphatically not a mere interest in shielding judges from criticism and personal discomfort. Rather, ensuring decorum ensures that the persons whose property and liberty are at stake in legal proceedings have their rights adjudicated fully, fairly, and according to the rule of law.

Duffer's concern that a juror might be negatively influenced by Sefick's sculpture was essentially concern over courthouse decorum. A juror who, in the courthouse, encounters an arguably cartoonish sculpture of a sitting judge commenting that all of his rulings are being overturned might conclude that the courthouse is something less than the sober and weighty place it must be, or that Judge Duff and his colleagues do not warrant the respect that their positions—not their personal feelings—require. Duffer reasonably and genuinely saw Sefick's sculpture as capable of negatively influencing jury deliberations. Others might differ as to whether the piece presented such a threat, but that does not make Duffer unreasonable.

With all this in mind, the influence-of-proceedings rationale withstands scrutiny. Sefick can perhaps criticize Defendants' reasoning with some success, but the reasoning is not unfounded or an obvious pretext for viewpoint discrimination.

Still, Sefick would no doubt argue that potential juror influence is a lot to read into a sculpture that the artist himself says had a viewpoint subject to interpretation. Indeed, the "meaning" of art is often uncertain, fluid, and subjective. Sefick may rightly claim that what his work says is a matter of interpretation, yet the more cryptic the viewpoint, the less likely it is that Defendants discriminated it. *See Claudio*, 836 F.Supp. at 1230. Defendants testified convincingly that they did not really appreciate the precise meaning or message of the sculpture in either of its incarnations. Defendants cannot readily discriminate against a viewpoint they cannot ascertain, one which the artist himself apparently intended to be elusive. Zbylut's denial of the second version of Sefick's sculpture was consistent with these notions; the second version became more cryptic and did not explicitly refer to Judge Duff, and Zbylut did not give potential influence of proceedings as a reason for rejecting the piece.

 Also, Sefick asserts that Defendants' rejection of the latest Judge Duff sculpture amounts to viewpoint discrimination because Defendants have permitted speech "on the same general subject matter in the past." (Proposed Findings and Conclusions, p. 8) Apparently, the past speech Sefick refers to is the sculpture depicting Judge Duff and Cindy Crawford. Sefick has produced no authority, and the Court is aware of none, that having once let in a sculpture of Judge Duff, GSA must let in another.

Still, what Sefick may be trying to say is that GSA is wrongfully picking and choosing among viewpoints that fall within the subject matter of displays that might influence proceedings. Yet the boundaries of viewpoint and subject matter are so fluid here, and the viewpoints so unclear, that the Court cannot brand GSA's different treatment of Sefick's Judge Duff sculptures viewpoint discrimination. Sefick did not testify as to what he intends his current sculpture to mean, except to say that whether the first version commented on the relationship between a district judge and the court of appeals was subject to interpretation. Of the two versions of the current sculpture, one explicitly identified Judge Duff but the other did not. According to Sefick, the sculpture of Cindy Crawford and Judge Duff was about "courtroom dynamics and control;" in Sefick's eyes "the control thing has a sexual element to it." (Ex. 3)

What are government property managers to make of all this? The First Amendment does not require that officials who manage a nonpublic forum have the artist's sensibilities regarding the messages embodied in creative works, nor the trial judge's sensibilities regarding courthouse decorum. All officials must do is act reasonably in light of the needs and primary purpose of the forum, and not to suppress an ascertainable viewpoint. *See Cornelius*, 473 U.S. at 808–11. Contrary to what Sefick suggests, the Court does not accept that Defendants approved of the viewpoint of the previous Judge Duff sculpture, but disapproved of the viewpoint of the current one and chose between them accordingly.[2]

The Court is mindful that some testimony indicated that the courts housed in the Dirksen Building were opposed to Sefick's sculpture because it would be an embarrassment to Judge Duff. However, this testimony lacked specificity and force; it was in the nature of second-and third-hand reports.

---

2. The summary judgment ruling in this case noted a previous case involving Sefick as possibly working against Defendants. *Sefick v. City of Chicago*, 485 F.Supp. 644 (N.D.Ill.1979). In that case, Sefick obtained an injunction allowing him to display a piece depicting Chicago's mayor. The district court found disingenuous the reasons city officials gave for why they allowed Sefick to display two other sculptures, but removed the one of the mayor. 485 F.Supp. at 650. Unlike that case, here, GSA's different treatment of Sefick's different sculptures has a satisfactory basis. Accordingly, this Court has reached a different result. Likewise, the present case is distinguishable from *Amato v. Wilentz*, 753 F.Supp. 543 (D.N.J.1990), *vacated on other grounds*, 952 F.2d 742 (3d Cir.1991), which the Court also noted in the summary judgment ruling as potentially unfavorable to Defendants.

Also, "embarrassment" can mean either personal embarrassment to Judge Duff—likely not a valid concern for First Amendment purposes—or objective embarrassment to the court system that might unduly threaten courthouse decorum—a valid concern as covered above. The evidence was inconclusive regarding which type of embarrassment the courts were supposedly concerned about. However, the evidence was conclusive that no Defendant rejected Sefick's work for the purpose of saving a judge or judges from personal embarrassment.

■ To show pretext in general, Sefick has stressed that it was actually counsel who wrote Gardner's and Zbylut's denial letters. Taken in context, there is nothing terribly sinister or unusual about this. Sefick's correspondence and his trial testimony show that he had rattled the litigation saber before in trying to place his work in the Dirksen Building, and was doing so again with respect to the current sculpture of Judge Duff. Of course, Sefick had every right to protect his perceived First Amendment rights with legal action, just as Defendants acted rightfully and prudently by seeking legal assistance in responding to Sefick's requests. Indeed, every word in the denial letters has been scrutinized in this case, just as Gardner and Zbylut might have suspected would happen when they sought the assistance of counsel.

On an overall note, perhaps one weakness in Defendant's case is that they have not articulated with all conceivable detail exactly what it was about Sefick's sculpture that was incompatible with construction, security concerns, and the need to avoid influencing court proceedings. The Court recognizes that Defendants' testimony could have said more to explain their thought processes. Yet Defendants' burden is simply to demonstrate that they acted reasonably and not to suppress a viewpoint. To meet that burden they need not deliver a dissertation from the witness stand—nor the exacting detail of a judicial opinion.

Based on the evidence, the facts found herein, and the relevant law, the Court concludes that Defendants' acted reasonably and not out of viewpoint discrimination. Thus, Defendants did not violate the First Amendment and Sefick is not entitled to relief.

At trial, Sefick objected to certain testimony by James Whitlock of GSA (not a defendant here) as irrelevant and not within the scope of the pretrial order. Under Sefick's standing objection, which the Court reserved ruling on, Whitlock testified that as of about a month before trial, GSA had adopted a security policy of banning any use of the Dirksen Building lobby, by GSA tenants or nontenants, that was not necessary to the operation of the building. The Court need not rule on Sefick's objection, because the above ruling has been reached without considering the portion of Whitlock's testimony that Sefick opposed. However, Sefick's posttrial brief perhaps indicates that he has changed his tune and now wants the Court to consider the testimony for the proposition that the new, total-ban policy is really a pretext that shows continuing efforts to suppress the viewpoint in Sefick's sculpture. Were the Court to consider the testimony for that purpose, it would reject Sefick's proposition and the ruling here would be the same.

*CONCLUSION*

For the foregoing reasons, the Clerk is ORDERED TO ENTER JUDGMENT forthwith in favor of Defendants and against Plaintiff, denying Plaintiff injunctive relief and all other relief, and DISMISSING this case with prejudice.